# Elizabeth Medenwald, Appellant, v. John J. Walton and T. A. Somerville, trading as Hunter, Walton & Company, Appellees.

## Gen. No. 23,878.

1. GAMING, § 47*—*when recovery of treble damages not proper on ground that transaction relates to.* Where butter is bought from brokers on margins and the purchaser makes a certain initial payment per tub on butter actually in a definite warehouse and gives his notes for the balance of the purchase price, secured by warehouse receipts for the butter, which are pledged as collateral to the amount of the notes, storage charges, insurance and interest, with the right to sell in case of a declining market, and the butter is sold, as the result of a declining market, leaving a balance due the brokers, the intentions of the parties will not be considered, and the seller will not be held liable under section 132 of the Criminal Code (J. & A. ¶ 3735) for treble the value of the money lost on the ground that the transaction was a gambling one.

2. GAMING, § 51*—*when question for jury whether there should be actual delivery of butter by broker and settlement of resulting mutual accounts.* In an action on notes given by the purchaser of butter to brokers in alleged payment of part of the purchase price of the butter, which was purchased by paying a certain initial sum per tub on the butter, which was actually in a designated warehouse, by giving notes for the balance and by pledging the warehouse receipts as collateral security for the amount of the notes, storage charges, insurance and interest, it was a question for the, jury, on conflicting evidence, whether it. was the intention that there should be an actual delivery of the butter and a settlement of the resulting mutual accounts.

Appeal from the Superior Court of Cook county; the Hon. JOSEPH B. DAVID, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1917. Affirmed. Opinion filed November 6, 1918.

WILLIAM R. JORDAN and GEORGE S. MARKS, for appellant; HOAG & ULLMANN, of counsel.

FRANK SCHOENFELD, for appellees.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff, Elizabeth Medenwald, brought suit on behalf of herself and Cook county against the defendants, John J. Walton and T. A. Somerville, copartners as Hunter, Walton & Company, under section 132 of the Criminal Code (J. & A. ¶ 3735) for the sum of $18,984.63, which was "treble the value of the money" claimed by the plaintiff to have been lost by her husband in certain gambling transactions in butter, carried on with the defendants in the years 1910 and 1911. The cause was tried before the court without a jury and judgment entered against the plaintiff for costs. From that judgment this appeal is taken.

Henry Medenwald, the husband of the plaintiff, for 2 or 3 years prior to 1910 conducted a small neighborhood store. For 27 years prior to that time he had been a tailor. The defendants were engaged in the butter business in Chicago and had been for a great many years.

It is the theory of the plaintiff that her husband, Henry Medenwald, between July 1 and July 18, 1910, entered into certain gambling contracts, involving the buying on margin from the defendants, certain quantities of butter; that he made certain payments or advances to the defendants by way of margin, and that it was understood between them that at some uncertain time in the future they would settle on the difference between the then market price and that agreed upon at the time the various contracts were made; that it was never the intention of Medenwald or the defendants that the butter should be received by or delivered to Medenwald. On the other hand, it is the theory of the defendants that it was a simple case of merchandising; that Medenwald bought the butter at a certain price and paid in cash a certain portion of the purchase price and gave promissory notes for the balance; that the particular butter purchased was either then in their

place of business or already stored in a warehouse; that warehouse receipts for the particular tubs of butter purchased were made out and delivered, at the time of the purchases, to Medenwald, and that Medenwald then turned over the warehouse receipts—and the promissory notes for the balance of the purchase price—to the defendants as collateral security for the amount of the notes, storage charges, insurance and interest; that afterwards, as the market price of the tubs of butter represented by the warehouse receipts declined, and as it was provided in the promissory notes, that if the security depreciated in value, it— the butter in storage—might be sold and the proceeds applied in liquidation of the amount of the notes and the other charges; and as the market did decline, the butter was accordingly sold and the proceeds applied on the notes.

The evidence shows that on or about June 13, 1910, Medenwald bought of defendants 301 tubs of butter for $5,343.38; on June 25, 1910, 437 tubs of butter for $7,677.33; on July 7, 1910, 444 tubs of butter for $8,050.96; and on July 15, 1910, 434 tubs of butter for $7,978.32. On July 2, 1910, Medenwald paid $2,214 on account; and on July 14, 1910, $1,332; and on July 19, 1910, $1,302, all of which together amounted to a payment of $3 a tub on each of the total 1,616 tubs which Medenwald purchased. For the amount of balance of the purchase price Medenwald gave the defendants four promissory notes, each dated July 1, 1910, and each payable on demand. In each of said notes it was recited (1) that Medenwald had deposited with the defendants as collateral security certain warehouse warrants for butter, and (2) that the defendants "in the event of said securities depreciating in value" in the opinion of the defendants, they were entitled at their discretion, without demanding payment or giving any notice, to sell the collateral security or any part thereof and apply the proceeds to the payment of the notes. A warehouse receipt, representing certain specified

tubs of butter stored in a named warehouse was attached to each promissory note. On December 30, 1910, the defendants wrote Medenwald informing him that they were closing up their accounts to January 1, 1911, and inclosing a statement of storage, interest and insurance charges up to January 1, 1911, and, further reciting, "on butter we are holding for you. Kindly look the statement over and send us check at your earliest convenience." On January 16, 1911, defendants again wrote to Medenwald as follows: "Due to the rapid decline in the butter market, and to the unsatisfactory condition of the same, we feel obliged at this time to ask you to give us more margin on the butter we are holding for you. We are sorry to have to do this, but under the circumstances we are sure you will appreciate our position in this matter. Kindly send us your check for $1,616, which is at the amount of $1 a tub. We, of course, trust that the present slump in the market is only temporary and that there will be a turn for the better before long." On February 8, 1911, the defendants again wrote Medenwald: "Holders of storage stock are getting uneasy and are now anxious to unload. * * * About six weeks more will see the end of the season. We therefore think it advisable to sell your butter as we find opportunity. We will get you the best price we can for your holdings." Subsequently the butter was sold by the defendants and a statement was sent by them to Medenwald. That statement is as follows:

"Mar. 23, 1911.

"1910

| | | | | |
|---|---|---|---|---|
| June | 13, to 301 T. Br. | | $5,343.38 | |
| June | 25, to 437 T. Br. | | 7,677.33 | |
| July | 7, to 444 T. Br. | | 8,050.96 | |
| July | 15, to 434 T. Br. | | 7,978.32 | |
| 1911 | | | | |
| Jan. | 3, Stge., Int. & Ins., Jan. | 1st. | $1,480.21 | |
| Jan. | 31, Stge., Int. & Ins., Feb. | 1st. | 299.89 | |
| Mar. | 23, Stge., Int. & Ins., Mar. | 1st. | 299.89 | $31,129.98 |

```
1910
July  2, By ck. on acct............$2,214.00
July 14, By ck. on acct...........  1,332.00
July 19, By ck. on acct...........  1,302.00
1911
Jan. 3, Ck. Stge., Ins., Int., Jan. 1.  1,480.21
Mar. 18, 1,182 T. Br.............16,512.87
Mar. 18,   434 T. Br.............  5,834.47    $28,675.55
```

Mar. 23 to balance due us.................$2,454.43"

The evidence of Medenwald—that they were gambling contracts—is that about June 13, 1910, he was in the office of the defendants and that one Somerville, a member of the firm, asked him if he had made up his mind to buy any butter, and that he, Medenwald, replied that he could not buy the butter as he did not have any money, that the only thing he could buy was a margin on butter the same as he had in 1908; that Somerville said, "we will call it margins; how much margins do you want to buy today"; that he told Somerville that it would depend upon how much margin he would have to put up per tub, "that all the money I had was $6,000, and I would have to govern myself accordingly"; that Somerville replied, "it will be $3 per tub, the same as I had put up in 1908"; that Somerville said he would buy the butter back again the same as he did in 1908. Further, that, after he began buying the butter, as he claims, on margin—having reference apparently to the first purchase, made on June 13, 1910—Somerville handed him a piece of paper and asked him to read it over; that Medenwald told him he thought it was all one sided, and that Somerville made the reply that it was only a matter of form. The evidence of Somerville, one of the defendants, is that in June, 1910, Medenwald went to the office of the defendants and said that he wanted to buy some butter and place it in cold storage; that accordingly, at that time, he, Medenwald, bought about 300 tubs, and they were placed in cold storage; that he said he would pay

$3 in advance on each tub and give a collateral note for
the balance; that the butter was in the place of busi-
ness of the defendants at that time; that that particu-
lar lot of butter was taken to the Booth cold storage
warehouse; that Medenwald looked over the warehouse
receipt, read the note and signed it, and gave them
back to the defendants; that substantially similar pro-
ceedings took place in regard to each of the other three
purchases.

According to the statement of March 23, 1911, cov-
ering the purchases of butter made on June 13 and 25,
1910, and July 7 and 15, 1910, those purchases, together
with storage, interest and insurance charges, aggre-
gated a total of $31,129.98; that the amount paid there-
on in cash by Medenwald was $6,328.21, and that the
amount received by the defendants for the sale of the
butter as collateral was $22,347.34, leaving a balance
due from Medenwald to the defendants of $2,454.43.
His loss on the transaction therefore was $6,328.21,
which he paid to the defendants, and $2,454.43, the
amount of his present indebtedness.

It seems that some years earlier, on July 3, 1908,
Medenwald had bought 125 tubs of butter of the de-
fendants and it was placed in Booth's cold storage
warehouse and that Medenwald paid in advance $375,
or $3 a tub for that butter; that on October 1, 1908, the
defendants wrote to him, stating: "We sold you over
100 tubs of butter for storage this summer and are
writing you so you will bear us in mind, and as soon as
you are ready to sell this butter or any other butter you
may have in storage, let us know, giving us your lowest
price and we will try and deal with you"; that, subse-
quently, in the fall of the year the defendants bought
it from him, agreeing as to the price, after charging
Medenwald storage and cartage charges, and that he
made $294.27 on the transaction. In the same year the
defendants bought 123 tubs of butter from Medenwald
which the latter had bought from M. L. Brown & Com-

pany and which was in storage in the Monarch warehouse, and on the instructions of Medenwald the defendants paid the Monarch Warehouse Company the amount they had advanced on that butter, and paid Medenwald the difference between that amount and the amount of the purchase price; that they, the defendants, also bought another lot of 150 tubs that Medenwald had purchased from George W. Linn & Son and which was stored at the Western Cold Storage Company's warehouse. They paid Linn & Son the storage charges and paid Medenwald the difference, being something over $2,200. Evidence of the three transactions just mentioned was admitted on the theory that they would help in determining the intention of the parties in 1910.

It is the contention of the plaintiff, as stated above, that the four contracts for the sale and purchase of the butter, all made in 1910, were gambling contracts. The cases of *Jamieson v. Wallace,* 167 Ill. 388, and *R. E. Pratt & Co. v. Ashmore,* 224 Ill. 587, are chiefly relied upon. It will be observed, however, that in the former case, Mr. Justice Magruder, who delivered the opinion of the court, said: "They (referring to certain stock brokers who purported to have bought 200 shares of stock for a customer) never tendered to her at any time the stocks, which they claim to have purchased for her, nor asked her for any money to pay the purchase price of such stocks." Where, in making a contract concerning personal property, it is the intention of the seller not to deliver and that of the purchaser not to receive—and no actual receipt and delivery takes place—and it is the intention of both to settle the resulting mutual account by the payment of the mere abstract mathematical difference, such contract, generally, is void and may not be enforced. In the instant case, no matter what was the psychological intention of either the purchaser or the seller, the evidence shows that when the warehouse receipts were made out

and attached to the promissory notes, the title to certain specific tubs of butter in a definite warehouse passed from the seller to the purchaser. When Medenwald paid $3 a tub in cash and gave his notes for the balance of the purchase price he became the owner of a specific, segregated quantity of butter. Although the notes were payable on demand they nevertheless became outstanding evidence of an indebtedness of Medenwald to the defendants. The specific butter, itself, had been paid for in full and the original obligation to pay for it had become extinguished; and there then existed a new obligation by Medenwald, evidenced by the promissory notes, the consideration for which was the title to the butter which had passed from the defendants to Medenwald, who then owned it. The fact that he pledged it as security for his promissory notes is conclusive evidence that it had been delivered by the defendants and received by Medenwald. To argue that the defendants still owned the butter which Medenwald admittedly agreed in writing, under his own signature, should be held by them as collateral security for his notes leads to a *reductio ad absurdum*. When, as a commercial transaction, a purchase and sale is completely consummated, the law is not then interested in the intentions of the parties which inspired it. The statute which was passed to prevent gambling contracts was not intended to punish a seller of merchandise where the thing sold has not only been delivered and the title passed but the contract of sale has been completely executed and there has arisen as an outgrowth a new and different obligation on the part of the purchaser, evidenced by promissory notes.

In the instant case, however, apart from the consideration of the matter as a pure question of law upon the facts admitted by Medenwald, himself, the evidence on the subject of the actual intention of the parties, at the time of the purchases and sales, was conflicting, and it became, as said in *Jamieson v. Wallace, supra*, "a

question for the jury or for the court, to be determined by a consideration of all the evidence''; and as the trial judge found for the defendants, and we believe now justifiably, there is no sufficient reason to set the judgment aside.

Finding no error in the record the judgment is affirmed.

*Affirmed.*